*109*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

APR 0 6 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| MARIA F. GUAJARDO, INDIVIDUALLY | & | |
| AS ADMINISTRATOR OF THE ESTATE | & | |
| OF JUAN JOSE GUAJARDO, AND AS | & | |
| GUARDIAN OF THOMAS GUAJARDO, | & | |
| III, CYNTHIA GUAJARDO, AND | & | |
| CAROLINE GUAJARDO, MINOR | & | CIVIL ACTION NO. 97-215 |
| CHILDREN AND ALEJANDRO GARCIA | & | |
| | & | |
| VS. | & | |
| | & | |
| EDUARDO TREVIÑO, INDIVIDUALLY | & | |

---

**SECOND AMENDED JOINT PRE-TRIAL ORDER**

---

### 1. APPEARANCE OF COUNSEL

1.  Plaintiffs:    **MARIA F. GUAJARDO, INDIVIDUALLY, and as
ADMINISTRATOR OF THE ESTATE OF JUAN JOSE
GUAJARDO, and as GUARDIAN OF THOMAS
GUAJARDO, III, CYNTHIA GUAJARDO, and CAROLINE
GUAJARDO, MINOR CHILDREN, and ALEJANDRO
GARCIA**

Plaintiffs' counsel:    Hon. Victor Quintanilla
State Bar No. 00786181
Federal Id. No. 16073
**LAW OFFICES OF
ERNESTO GAMEZ, JR., P.C.**
777 E. Harrison Street
Brownsville, Texas  78520
Telephone No.:  (956) 541-3820
Facsimile No.:  (956) 541-7694

2.  Defendant:  **EDUARDO TREVIÑO, INDIVIDUALLY**

Defendant's counsel:    Hon. George C. Kraehe
State Bar No. 00792631
Federal Id. No. 19355
**WILLETTE & GUERRA, L.L.P.**
3505 Boca Chica Blvd., Suite 460
Brownsville, Texas  78521
Telephone No.:  (956) 541-1846
Facsimile No.:  (956) 541-1893

## 2. STATEMENT OF THE CASE

This is a wrongful death and survivorship action brought by Plaintiffs against Defendant **EDUARDO TREVIÑO** under 42 U.S.C.§1983 alleging deprivation of **JUAN JOSE GUAJARDO's** rights under the United States Constitution to be free from the use of excessive force. Plaintiffs make this claim against Defendant **EDUARDO TREVIÑO** as a result of an altercation between **JUAN JOSE GUAJARDO** and **EDUARDO TREVIÑO** which occurred on **April 8, 1997** at the Brownsville City Jail. **MR. GUAJARDO** sustained certain bodily injuries as a result of the altercation and subsequently died on **April 9, 1997**. Defendant **TREVIÑO** was a detention officer employed by the City of Brownsville at the Brownsville City Jail at the time of the incident made the basis of this civil action. Plaintiffs seek to recover compensatory damages, past medical expenses incurred, funeral and burial expenses, and punitive (exemplary) damages from Defendant **TREVIÑO**.

## 3. JURISDICTION

42 U.S.C. § 1983 vests jurisdiction of this case in the United States District Court for the Southern District of Texas. Because the incident made the basis of this lawsuit occurred in Brownsville, the Brownsville Division has venue of this civil action. Jurisdiction is undisputed.

## 4. MOTIONS

The following motions are pending at the time of the Pretrial Conference:

1.   Defendant's Motion in Limine. (See attached).

2.   (a)   Plaintiffs' Motion in Limine.   (See attached).

     (b)   Plaintiffs' Objections to and Request for Authentication of Defendant's Exhibits (filed on April 2, 2001).

2

CUtePDF - www.texis.com

(14)   In this holding position, Defendant **EDUARDO TREVIÑO** slammed **MR. GUAJARDO's** head against a steel access door, which caused **MR. GUAJARDO** to bounce to the lateral wall in the main hall.

(15)   While Defendant **EDUARDO TREVIÑO** had **MR. GUAJARDO** in the "choke hold", Jail Matron, Ana Hernandez, then grabbed **MR. GUAJARDO** from the legs causing him to fall to the ground faced down.

(16)   This incident lasted for a few minutes with the "choke hold" for about two minutes.

(17)   Defendant **EDUARDO TREVIÑO** applied the "choke hold" to **MR. GUAJARDO** and changed his hold at least once from right to left or visa versa.  Thereafter, Defendant **TREVIÑO** dragged **MR. GUAJARDO** to a padded cell.

(18)   Since **MR. GUAJARDO** was gurgling and having trouble breathing, Defendant **EDUARDO TREVIÑO** argued with Jail Matron, Ana Hernandez, about whether to call Brownsville EMS or not.  Defendant **TREVIÑO** did not want to call the EMS unit.

(19)   Upon arrival at the Brownsville City Jail, a Brownsville EMS attendant checked **MR. GUAJARDO** who appeared to be unconscious. The Brownsville EMS attendant further examined **MR. GUAJARDO** who, by then, was not breathing and had not pulse.

(20)   The Brownsville EMS attendant radioed a "CODE BLUE" call to the Brownsville EMS supervisor, and another unit was dispatched for assistance.

(21)   The Brownsville EMS attendant administered CPR, hyperventilation, intubation, IV line place, EPI and Atropine was used, sodium bicarbinnte, and the EKG tracing indicated that there was no response from **MR. GUAJARDO.**

(22)   After Brownsville EMS attempted to resuscitate **MR. GUAJARDO,** he was transported to Brownsville Medical Center where he was treated and required advanced life support, "FULL CODE BLUE".

(23)   **MR. GUAJARDO** never regained consciousness from the "choke hold" and died at Brownsville Medical Center approximately twenty-four (24) hours later on **April 9, 1997.**

(24)   Defendant **EDUARDO TREVIÑO's** actions violated **MR. GUAJARDO's** constitutional rights.

(25)   **MR. GUAJARDO** was unarmed and helpless, and in no way posed a threat to Defendant **EDUARDO TREVIÑO** on **April 8, 1997.**

4

(26)   The force applied by Defendant **EDUARDO TREVIÑO** on **April 8, 1997** was not done in a good faith effort to maintain or restore discipline, rather it was one for the purpose of causing harm to **MR. GUAJARDO.**

(27)   Defendant **EDUARDO TREVIÑO** had either no training or inadequate training in carrying his duties as a detention officer at the Brownsville City Jail.

(28)   The lack of education, experience, and/or training is a contributing cause in the use of the excessive force upon **MR. GUAJARDO.**

(29)   As a direct and proximate result of the conduct of Defendant **EDUARDO TREVIÑO, MR. GUAJARDO** suffered abrasions to the right forehead, bridge of the nose, elbow, bruises to his back, right side of his face, elbows, arms, legs, and a **"choke hold"**, which resulted in the hemorrhaging to his left eye, neck, just behind the right ear, and his entire body.

(30)   The **"choke hold"** prevented the blood and air flow through **MR. GUAJARDO's** body which caused his body to go into shock and resulted in his untimely death.

(31)   The loss of consciousness and death points toward asphyxia as the mechanism that triggered the chain of events that killed **MR. GUAJARDO.**

(32)   **MR. GUAJARDO's** entire body was bruised, battered, and contused, and he suffered great shock to his entire nervous system.

(33)   **MR. GUAJARDO** further suffered the following injuries:

(a)   Massive injuries to his entire body as a result of the excessive force which were aggravated by Defendant **TREVIÑO's "choke hold"**.

(b)   Great shock to his entire nervous system from the **"choke hold" by Defendant TREVIÑO**, which caused his heart attack.

(c)   Great physical mental pain and anguish from the excessive force used on him by Defendant **TREVIÑO.**

(34)   **MR. GUAJARDO** died on **April 9, 1997** as a direct and proximate result of the subject occurrence and the injuries inflicted upon him by the conduct of Defendant **EDUARDO TREVIÑO**, including, but not limited to the violation of **MR. GUAJARDO's** constitutional rights.

(35)   As a result of Defendant **EDUARDO TREVIÑO's** conduct, **MR. GUAJARDO** suffered great physical and mental pain and anguish. He suffered from being battered and placed in a **"choke hold"** which resulted in a heart attack, being brought back to life, and taken to the hospital for treatment.

5

(36)  **MR. GUAJARDO** suffered great shock to his entire body and nervous system. **MR. GUAJARDO** died on **April 9, 1997**, after several hours of conscious pain and suffering.

(37)  **MR. GUAJARDO** was the father of **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO**, and **ALEJANDRO GARCIA**.

(38)  During his lifetime, **MR. GUAJARDO** was industrious and energetic, a good father, a good son, and provider. He performed numerous and usual tasks in and about the family residence, and gave advice, counsel, comfort, care and protection to his mother and children. In all reasonable probability, he would have continued to do so, providing for and supporting his mother for the remainder of her natural life, and caring for and supporting his children at least until they attained adulthood, and probably thereafter.

(39)  **MARIA F. GUAJARDO** has suffered pecuniary losses from the death of her son, **JUAN JOSE GUAJARDO**, including, loss of care, maintenance, support, services, advice, counsel, society, companionship, mental anguish, the emotional and mental trauma resulting from the untimely death of a loved one, funeral and burial expenses, and contribution of a pecuniary value that she would in all reasonable probability, have received from her son during his lifetime had he lived.

(40)  **MARIA F. GUAJARDO** has suffered the destruction of the parent-child relationship and mental depression and anguish, grief and sorrow as a result of the death of her son, **JUAN JOSE GUAJARDO**, is likely to continue to suffer for a long time in the future.

(41)  **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO**, and **ALEJANDRO GARCIA** have suffered pecuniary losses from the death of their father, **JUAN JOSE GUAJARDO**, including, loss of care, maintenance, support, services, advice, counsel, society, companionship, mental anguish, the emotional and mental trauma resulting from the untimely death of a loved one, funeral and burial expenses, and contribution of a pecuniary value that they would in all reasonable probability, have received from their father during his lifetime had he lived.

(42)  **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO**, and **ALEJANDRO GARCIA** have suffered the destruction of the parent-child relationship and mental depression and anguish, grief and sorrow as a result of the death of their father, **JUAN JOSE GUAJARDO**, is likely to continue to suffer for a long time in the future.

(43)  Plaintiffs suffered a loss of inheritance that, in all reasonable probability, **MR. GUAJARDO** would have left to them by will or inheritance.

6

(44)   The Estate of **MR. GUAJARDO** has paid or incurred liability to pay **FIVE THOUSAND FOUR HUNDRED SIXTY-ONE AND NO/100THS DOLLARS ($5,461.00)** in funeral and burial services, which is a reasonable and customary charge.

(45)   The Estate of **MR. GUAJARDO** has paid or incurred liability to pay reasonable and necessary charges for medical care and treatment, including, **FOUR HUNDRED FORTY-THREE AND NO/100THS DOLLARS ($443.00)** for ambulance services, and **THIRTY-TWO THOUSAND FIVE HUNDRED SEVENTY AND 70/100THS ($32,570.70)** for hospital services, physician fees, and supplies.

(46)   Plaintiffs contend that Defendant **EDUARDO TREVIÑO** struck the **"first blow"** to **JUAN JOSE GUAJARDO** and that he started the altercation.

## B.   DEFENDANT'S CONTENTIONS:

(1)   Guajardo was highly intoxicated at the time of the incident made the basis of this lawsuit.

(2)   Guajardo was under the influence of cocaine at the time of the incident made the basis of this lawsuit.

(3)   Guajardo was hostile, belligerent, aggressive, and uncooperative at the time of the incident made the basis of this lawsuit, and had been investigated for a possible assault occurring prior to Guajardo s arrest on April 8, 1997.

(4)   Guajardo was hostile, belligerent, aggressive, and uncooperative during his stay at the Brownsville City Jail.  Because of Guajardo's behavior, Officer Treviño attempted to direct Guajardo to the padded cell for his safety, the safety of the other detainees, and the safety of the prison staff.

(5)   In response to Officer Treviño's attempt to direct him to the padded cell, Guajardo became verbally abusive, hostile, and aggressive.

(6)   Guajardo, without provocation, assaulted Officer Treviño.

(7)   Guajardo lifted Officer Treviño off the ground and pinned him against a wall.

(8)   To restore discipline and to defend himself from physical harm or even death, Officer Treviño executed a bear hug around Guajardo's upper chest and neck area and pushed with his feet against the wall.

(9)   Officer Hernandez, first noticing the struggle only after it started, came to Officer Treviño's assistance.

7

(10)   Officer Hernandez pulled on Guajardo's pant leg and applied
       pressure to the back of his knee, bringing him and Officer Treviño
       to the ground.

(11)   Guajardo continued to resist after he was brought to the ground.

(12)   Officers Treviño and Hernandez hand-cuffed Guajardo and brought
       him to the padded cell.

(13)   After bringing the prisoner to the padded cell, Officer Treviño
       noticed that Guajardo was having trouble breathing.

(14)   Officer Hernandez immediately called EMS, which arrived one (1) or
       two (2) minutes later.

(15)   EMS personnel immediately started treating Guajardo, but found no
       signs of breathing or a pulse. CPR was administered, and Guajardo
       was transported to Brownsville Medical Center for further treatment.

(16)   Guajardo was diagnosed as having a full cardiac arrest. Guajardo
       never regained consciousness and died a day later on April 9, 1997,
       at 11:45 p.m..

(17)   Guajardo's body was transported to Valley Baptist Medical Center in
       Harlingen, Texas, where Margie W. Cornwell, M.D., performed an
       autopsy on April 10, 1997.

(18)   Guajardo had a blood-alcohol content of .212 at the time of his death
       (more than twice legal intoxication), high levels (190 ng/ml) of
       cocaine in his bloodstream, and had a history of heart disease and
       heart attacks.

(19)   There were no signs of significant lethal trauma to Guajardo by
       external and internal examination of the organs, including the skull,
       brain, and neck. The only bruising on the neck appears to have
       been caused in the course of Guajardo's medical treatment.  There
       were no bruises or any signs of choking.

(20)   Dr. Cornwell determined Guajardo's cause of death to be arrhythmia
       brought on by decedent's "abnormal heart." Dr. Cornwell stated in
       her autopsy report: "Such an abnormal heart would be susceptible to
       sudden lethal cardiac arrhythmia. Coupling such an abnormal heart
       with cocaine toxicity and alcohol abuse could readily produce lethal
       arrhythmia, particularly in this man's physically agitated state."

(21)   Eduardo Treviño's use of force was appropriate under the
       circumstances in that it was applied in a good faith effort to restore
       discipline, was not excessive, was not malicious, wanton, or
       sadistic.

8

(22)   Eduardo Treviño is entitled to qualified immunity because his actions were objectively reasonable under the circumstances with reference to clearly established law.

## 6.   ADMISSIONS OF FACT

**A.   PLAINTIFFS' ADMISSIONS OF FACT:**

(1)   Plaintiffs admit that **JUAN JOSE GUAJARDO** was arrested for public intoxication on **April 8, 1997.**

(2)   Plaintiffs admit that **JUAN JOSE GUAJARDO** was thirty-nine (39) years of age on **April 8, 1997.**

(3)   Plaintiffs admit that **JUAN JOSE GUAJARDO** lived with his mother, **MARIA F. GUAJARDO** at 2125 Southmost Road, Brownsville, Texas.

(4)   Plaintiffs admit that **JUAN JOSE GUAJARDO** died on **April 9, 1997** at Brownsville Medical Center in Brownsville, Texas.

(5)   Plaintiffs admit that **JUAN JOSE GUAJARDO** placed a telephone call to his mother, **MARIA F. GUAJARDO,** on the evening of **April 8, 1997** from the Brownsville City Jail.

(6)   Plaintiffs admit that **JUAN JOSE GUAJARDO** was taken to the Brownsville City Jail or Municipal Jail following his arrest on **April 8, 1997.**

(7)   Plaintiffs admit that **JUAN JOSE GUAJARDO** was the father of **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO,** and **ALEJANDRO GARCIA.**

**B.   DEFENDANT'S ADMISSIONS OF FACT**

(1)   Defendant admits that **JUAN JOSE GUAJARDO** was arrested for public intoxication on **April 8, 1997.**

(2)   Defendant admits that **JUAN JOSE GUAJARDO** was thirty-nine (39) years of age on **April 8, 1997.**

(3)   Defendant admits that **JUAN JOSE GUAJARDO** died on **April 9, 1997** at Brownsville Medical Center in Brownsville, Texas.

(4)   Defendant admits that **JUAN JOSE GUAJARDO** placed a telephone call to his mother, **MARIA F. GUAJARDO,** on the evening of **April 8, 1997** from the Brownsville City Jail.

(5)   Defendant admits that **JUAN JOSE GUAJARDO** was taken to the Brownsville City Jail or Municipal Jail following his arrest on **April 8, 1997.**

9

(6)     Defendant admits that **EDUARDO TREVIÑO** worked as a detention officer at the Brownsville City Jail.

(7)     Defendant admits **EDUARDO TREVIÑO** worked as a detention officer at the Brownsville City Jail.

(8)     Defendant admits that **EDUARDO TREVIÑO** was a detention officer at the Brownsville City Jail on **April 8, 1997.**

(9)     Defendant admits that **MR. GUAJARDO** was born on **February 9, 1958.**

(10)    Defendant admits that **MR. GUAJARDO** died on **April 9, 1997** at the age of thirty-nine (39) years of age.

(11)    Defendant admits that **MR. GUAJARDO** died at Brownsville Medical Center in Brownsville, Texas.

(12)    Defendant admits that **MR. GUAJARDO** was arrested for public intoxication by Brownsville police on **April 8, 1997.**

(13)    Defendant admits that **MR. GUAJARDO** was booked into the Brownsville City Jail and placed into a single cell.

(14)    Defendant admits that at approximately 9:25 p.m., **MR. GUAJARDO** was allowed to use the jail telephone.

(15)    Defendant admits that after using the telephone and on the way back to his cell, a verbal confrontation between **MR. GUAJARDO** and Defendant **EDUARDO TREVIÑO** commenced in regard to a blanket.

(16)    Defendant admits that upon arrival at the Brownsville City Jail, a Brownsville EMS attendant checked **MR. GUAJARDO** who appeared to be unconscious.  The Brownsville EMS attendant further examined **MR. GUAJARDO** who, by then, was not breathing and had not pulse.

(17)    Defendant admits that the Brownsville EMS attendant radioed a "CODE BLUE" call to the Brownsville EMS supervisor, and another unit was dispatched for assistance.

(18)    Defendant admits that the Brownsville EMS attendant administered CPR, hyperventilation, intubation, IV line place, EPI and Atropine was used, sodium bicarbinnte, and the EKG tracing indicated that there was no response from **MR. GUAJARDO.**

(19)    Defendant admits that after Brownsville EMS attempted to resuscitate **MR. GUAJARDO**, he was transported to Brownsville Medical Center where he was treated and required advanced life support, **"FULL CODE BLUE".**

CMsPDF - www.twsio.com

(20)   Defendant admits that **MR. GUAJARDO** never regained consciousness and died at Brownsville Medical Center approximately twenty-four (24) hours later on **April 9, 1997.**

## 7.   CONTESTED ISSUES OF FACT

(1)   Plaintiffs dispute Defendant's contention that any loss or damages allegedly sustained by Plaintiffs at the time, place, and occasion mentioned in **Plaintiffs' Second Amended Complaint** were caused, in whole or in part, or were contributed to, by the negligence of **JUAN JOSE GUAJARDO,** and not by any negligence or fault or want of care on the part of Defendants.

(2)   Plaintiffs dispute Defendant's contention that Plaintiffs' injuries and damages alleged were caused in whole or in part, or contributed to, by the negligence, fault, or want of care of parties, persons or instrumentalities over whom Defendants exercised no control and for whose acts Defendants are not under the law responsible.

(3)   Plaintiffs dispute Defendant's contention that the use of force alleged in **Plaintiffs' Second Amended Complaint** was necessary under the circumstances, was privileged under the law as an act of self-defense or for other reasons, and was in every way constitutional under constitutional standards applicable at the time of the incident made the basis of this lawsuit.

(4)   Plaintiffs dispute Defendant's contention that at the time of **JUAN JOSE GUAJARDO's** booking on **April 8, 1997,** he was uncooperative, belligerent, intoxicated, and under the influence of cocaine.

(5)   Plaintiffs dispute Defendant's contention and/or assertion that as a result of his belligerent behavior, **JUAN JOSE GUAJARDO** was placed in a single cell for his own safety and that of the other inmates.

(6)   Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** became agitated and belligerent towards Defendant **EDUARDO TREVIÑO** over a request for blankets.

(7)   Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** grabbed Defendant **EDUARDO TREVIÑO's** uniform, spun him around, and slammed him (i.e. Defendant **TREVIÑO**) against a corner wall outside the women's drunk tank ("WDT").

(8)   Plaintiffs dispute Defendant's contention and/or assertion that Defendant **EDUARDO TREVIÑO,** defending himself, placed **JUAN JOSE GUAJARDO** in a bear hug, wrapped his arms around **MR. GUAJARDO's** neck, and attempted to push off the wall with his feet.

(9)   Plaintiffs dispute Defendant's contention and/or assertion that Defendant **EDUARDO TREVIÑO** acted in good faith to maintain or restore discipline in dealing with **JUAN JOSE GUAJARDO** on **April 8, 1997.**

11

(10) Plaintiffs dispute Defendant's contention and/or assertion that Defendant **EDUARDO TREVIÑO** had to restore discipline and defend himself from physical harm or even death on **April 8, 1997**.

(11) Plaintiffs dispute Defendant's contention and/or assertion that Defendant **EDUARDO TREVIÑO's** actions on **April 8, 1997** were taken in response to the drug-induced aggressiveness of a career criminal and drug abuser in an attempt to restore institutional security and discipline.

(12) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** assaulted Defendant **EDUARDO TREVIÑO** and in essence delivered the first blow on **April 8, 1997**.

(13) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** was more than twice the legal limit for intoxication at the time of his arrest on **April 8, 1997**.

(14) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** was under the influence of cocaine at the time of his arrest on **April 8, 1997**.

(15) Plaintiffs dispute Defendant's contention and/or assertion that on **April 8, 1997, JUAN JOSE GUAJARDO** was placed in a cell by himself because he posed a safety risk to himself, other prisoners and to jail employees.

(16) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** assaulted Defendant **EDUARDO TREVIÑO** without provocation on **April 8, 1997**.

(17) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** suffered from any heart disease.

(18) Plaintiffs dispute Defendant's contention and/or assertion that Defendant **EDUARDO TREVIÑO** was slammed against a wall and placed in jeopardy of physical injury or even death.

(19) Plaintiffs dispute Defendant's contention and/or assertion that on **April 8, 1997**, after the altercation between **JUAN JOSE GUAJARDO** and Jailer **EDUARDO TREVIÑO**, the Defendant immediately noticed that **JUAN JOSE GUAJARDO** was having difficulty breathing.

(20) Plaintiffs dispute Defendant's contention and/or assertion that Jailer **EDUARDO TREVIÑO** immediately called or caused to be called EMS after noticing that **JUAN JOSE GUAJARDO** was having difficulty breathing.

(21) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** died on **April 9, 1997** of a heart attack brought on by a combination of his severe heart disease, his simultaneous use of alcohol and cocaine and his physically agitated state.

12

(22) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO's** death was not caused by any lack of supervision and/or training with respect to Defendant **EDUARDO TREVIÑO.**

(23) Plaintiffs dispute Defendant's contention and/or assertion that **JUAN JOSE GUAJARDO** did not suffer deprivation of his constitutional rights.

(24) Plaintiffs dispute Defendant's contention and/or assertion that he is entitled to the defense of quality immunity.

(25) Defendant contests all of Plaintiffs' contentions and allegations set forth herein and in Plaintiffs' pleadings except those expressly admitted herein and expressly denies that Defendant used excessive force against Juan Jose Guajardo in violation of the Fourteenth Amendment to the United States Constitution and specifically denies that the defense of qualified immunity is not available to him.

(26) Defendant disputes Plaintiffs' contention that while other inmates were offering a blanket to **MR. GUAJARDO,** Defendant **EDUARDO TREVIÑO** pulled **MR. GUAJARDO** back towards the booking area while applying a "choke hold" from behind, around **MR. GUAJARDO's** neck.

(27) Defendant disputes Plaintiffs' contention that in this holding position, Defendant **EDUARDO TREVIÑO** slammed **MR. GUAJARDO's** head against a steel access door, which caused **MR. GUAJARDO** to bounce to the lateral wall in the main hall.

(28) Defendant disputes Plaintiffs' contention that while Defendant **EDUARDO TREVIÑO** had **MR. GUAJARDO** in the "choke hold", Jail Matron, Ana Hernandez, then grabbed **MR. GUAJARDO** from the legs causing him to fall to the ground faced down.

(29) Defendant disputes Plaintiffs' contention that this incident lasted for a few minutes with the "choke hold" for about two minutes.

(30) Defendant disputes Plaintiffs' contention that Defendant **EDUARDO TREVIÑO** applied the "choke hold" to **MR. GUAJARDO** and changed his hold at least once from right to left or visa versa. Thereafter, Defendant **TREVIÑO** dragged **MR. GUAJARDO** to a padded cell.

(31) Defendant disputes Plaintiffs' contention since **MR. GUAJARDO** was gurgling and having trouble breathing, Defendant **EDUARDO TREVIÑO** argued with Jail Matron, Ana Hernandez, about whether to call Brownsville EMS or not. Defendant **TREVIÑO** did not want to call the EMS unit.

(32) Defendant disputes that **MR. GUAJARDO** was ever put in a lethal "choke hold".

(33) Defendant denies that **EDUARDO TREVIÑO's** actions violated **MR. GUAJARDO's** constitutional rights.

13

CbjPDF – www.texisa.com

(34)   Defendant denies that **MR. GUAJARDO** was unarmed and helpless, and in not way posed a threat to Defendant **EDUARDO TREVIÑO** on **April 8, 1997**.

(35)   Defendant denies Plaintiffs' contention that the force applied by Defendant **EDUARDO TREVIÑO** on **April 8, 1997** was not done in a good faith effort to maintain or restore discipline, rather it was one for the purpose of causing harm to **MR. GUAJARDO**.

(36)   Defendant denies Plaintiffs' contention that Defendant **EDUARDO TREVIÑO** had either no training or inadequate training in carrying his duties as a detention officer at the Brownsville City Jail.

(37)   Defendant denies Plaintiffs' contention that the lack of education, experience, and/or training is a contributing cause in the use of the excessive force upon **MR. GUAJARDO**.

(38)   Defendant denies Plaintiffs' contention that as a direct and proximate result of the conduct of Defendant **EDUARDO TREVIÑO**, **MR. GUAJARDO** suffered abrasions to the elbow, bruises to his back, right side of his face, elbows, arms, legs, and a **"choke hold"**, which resulted in the hemorrhaging to his left eye, neck, just behind the right ear, and his entire body.

(39)   Defendant denies Plaintiffs' contention that any **"choke hold"** prevented the blood and air flow through **MR. GUAJARDO's** body which caused his body to go into shock and resulted in his untimely death.

(40)   Defendant denies Plaintiffs' contention that any loss of consciousness and death points toward asphyxia as the mechanism that triggered the chain of events that killed **MR. GUAJARDO**.

(41)   Defendant denies Plaintiffs' contention that **MR. GUAJARDO's** entire body was bruised, battered, and contused, and he suffered great shock to his entire nervous system.

(42)   Defendant denies that **MR. GUAJARDO** further suffered the following injuries:

   a.   Massive injuries to his entire body as a result of the excessive force which were aggravated by Defendant **TREVIÑO's** **"choke hold"**.

   b.   Great shock to his entire nervous system from the **"choke hold"** by Defendant **TREVIÑO**, which caused his heart attack.

   c.   Great physical mental pain and anguish from the excessive force used on him by Defendant **TREVIÑO**.

(43)   Defendant denies Plaintiffs' contention that **MR. GUAJARDO** died on **April 9, 1997** as a direct and proximate result of the subject occurrence and the injuries inflicted upon him by the conduct of Defendant **EDUARDO TREVIÑO**, including, but not limited to the violation of **MR. GUAJARDO's** constitutional rights.

14

(44) Defendant denies Plaintiffs' contention that as a result of Defendant **EDUARDO TREVIÑO's** conduct, **MR. GUAJARDO** suffered great physical and mental pain and anguish.  He suffered from being battered and placed in a **"choke hold"** which resulted in a heart attack, being brought back to life, and taken to the hospital for treatment.

(45) Defendant denies Plaintiffs' contention that **MR. GUAJARDO** suffered great shock to his entire body and nervous system.  **MR. GUAJARDO** died on **April 9, 1997,** after several hours of conscious pain and suffering.

(46) Defendant denies Plaintiffs' contention that **MR. GUAJARDO** was the father of **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO,** and **ALEJANDRO GARCIA** and that **MARIA F. GUAJARDO** was his mother.

(47) Defendant denies Plaintiffs' contention that during his lifetime, **MR. GUAJARDO** was industrious and energetic, a good father, a good son, and provider.  He performed numerous and usual tasks in and about the family residence, and gave advise, counsel, comfort, care and protection to his mother and children.

(48) Defendant denies Plaintiffs' contention that **GUAJARDO** in all reasonable probability, he would have continued to do so, providing for and supporting his mother for the remainder of her natural life, and caring for and supporting his children at least until they attained adulthood, and probably thereafter.

(49) Defendant denies Plaintiffs' contention that **MARIA F. GUAJARDO** has suffered pecuniary losses from the death of her son, **JUAN JOSE GUAJARDO,** including, loss of care, maintenance, support, services, advise, counsel, society, companionship, mental anguish, the emotional and mental trauma resulting from the untimely death of a loved one, funeral and burial expenses, and contribution of a pecuniary value that she would in all reasonable probability, have received from her son during his lifetime had he lived.

(50) Defendant denies Plaintiffs' contention that **MARIA F. GUAJARDO** has suffered the destruction of the parent-child relationship and mental depression and anguish, grief and sorrow as a result of the death of her son, **JUAN JOSE GUAJARDO,** is likely to continue to suffer for a long time in the future.

(51) Defendant denies Plaintiffs' contention that **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO,** and **ALEJANDRO GARCIA** have suffered pecuniary losses from the death of their father, **JUAN JOSE GUAJARDO,** including, loss of care, maintenance, support, services, advise, counsel, society, companionship, mental anguish, the emotional and mental trauma resulting from the untimely death of a loved one, funeral and burial expenses, and contribution of a pecuniary value that they would in all reasonable probability, have received from their father during his lifetime had he lived.

15

CREATOR - www.texto.com

(52)   Defendant denies Plaintiffs' contention that **THOMAS GUAJARDO, III, CYNTHIA GUAJARDO, CAROLINE GUAJARDO,** and **ALEJANDRO GARCIA** have suffered the destruction of the parent-child relationship and mental depression and anguish, grief and sorrow as a result of the death of their father, **JUAN JOSE GUAJARDO,** is likely to continue to suffer for a long time in the future.

(53)   Defendant denies Plaintiffs' contention that Plaintiffs suffered a loss of inheritance that, in all reasonable probability, **MR. GUAJARDO** would have left to them by will or inheritance.

(54)   Defendant denies Plaintiffs' contention that the Estate of **MR. GUAJARDO** has paid or incurred liability to pay **FIVE THOUSAND FOUR HUNDRED SIXTY-ONE AND NO/100THS DOLLARS ($5,461.00)** in funeral and burial services, which is a reasonable and customary charge.

(55)   Defendant denies Plaintiffs' contention that the **ESTATE OF MR. GUAJARDO** has paid or incurred liability to pay reasonable and necessary charges for medical care and treatment, including, **FOUR HUNDRED FORTY-THREE AND NO/100THS DOLLARS ($443.00)** for ambulance services, and **THIRTY-TWO THOUSAND FIVE HUNDRED SEVENTY AND 70/100THS ($32,570.70)** for hospital services, physician fees, and supplies.

(56)   Defendant denies Plaintiffs' contention that **EDUARDO TREVIÑO** struck the "first blow" to **JUAN JOSE GUAJARDO** and that he started the altercation.

## 8.  AGREED PROPOSITIONS OF LAW

(1)   A plaintiff alleging excessive force must claim that he "**suffered at least some form of injury**" <u>Jackson v. R.E. Culbertson</u>, 984 F.2d 699, 700 (5th Cir. 1993).

(2)   In determining whether force is applied in a good faith effort to maintain or restore discipline, courts must balance the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 8.  The United States Supreme Court has recognized that it is a difficult task to balance these factors:

"[O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force.  Despite the weight of these competing concerns, corrections officials must make their decisions "in haste, under pressure, and frequently without the luxury of a second chance."

Id. at 7 (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986)).

16

(3)     In excessive force cases, a pretrial detainee receives the protection of the
        Due Process Clause of the Fourteenth Amendment, not the Fourth
        Amendment.  Valencia v. Wiggins, 981 F.2d 1440, 1443-45 (5th Cir.), cert.
        denied, 509 U.S. 905 (1993).

(4)     A court examining the defense of qualified immunity must "employ a two
        step analysis."  Mangieri v. Clifton, 29 F.3d 1012, 1016 (5th Cir. 1994).
        "First, the court must determine whether the plaintiff has alleged a
        violation of a clearly established constitutional right."  Baker v. Putnal, 75
        F.3d 190, 198 (5th Cir. 1996) (construing Siegert v. Gilley, 500 U.S. 226
        (1991)).  If the answer to the first question is "yes," then "the issue
        becomes the objective legal reasonableness of the defendants' conduct
        under the circumstances."  Baker v. Putnal, 75 F.3d at 19 (citing Quives
        v. Campbell, 934 F.2d at 670-71).  Once a defendant asserts the defense of
        qualified immunity, the burden shifts to the plaintiff to overcome it.
        Whatley v. Philo, 817 F.2d 19 (5th Cir. 1987).

(5)     "The burden of proof is on the plaintiff to overcome the defendant s
        defense of qualified immunity. To do so, the plaintiff must show that the
        defendants' conduct was not objectively reasonable and, further, that the
        defendants violated clearly established law."  Burns-Toole v. Byrne, II
        F.3d 1270, 1274 (5th Cir. 1994) (footnotes omitted).

(6)     Plaintiff must show under 42 U.S.C. § 1983 that Defendant is a person who
        acted under color of state law and whose conduct deprived Plaintiff of a
        right under the United States Constitution. 42 U.S.C. § 1983.

(7)     42 U.S.C. § 1983 is not itself a source of substantive rights, but merely
        provides a method for vindicating federal rights elsewhere conferred.
        Baker v. McCollan, 443 U.S. 137, 144, n.3 (1979).

(8)     Under Valencia, the appropriate inquiry is "whether the measure taken
        inflicted unnecessary and wanton pain and suffering" and "whether force
        was applied in a good faith effort to maintain or restore discipline, or
        maliciously and sadistically for the very purpose of causing harm." Id. at
        1446 (citing Hudson v. McMillian, 503 U.S. 1 (1992)); see also Brothers v.
        Klevenhagen, 28 F.3d 452 (5th Cir. 1994) (stating same rule); Rankin v.
        Klevenhagen, 5 F.3d 103 (5th Cir. 1993) (stating same rule). "the amount
        of force that is constitutionally permissible . . . must be judged by the
        context in which that force is deployed." Ikerd v. Blair, 101 F.3d 430, 434
        (5th Cir. 1996).  To this end, when evaluating Hudson factors, the finder
        of fact must keep in mind that prison officials "may have had to act quickly
        and decisively." Valencia, 981 F.2d at 1446.  Accordingly, they are entitled
        to wide-ranging deference. Id.

(9)     An inmate's sore, bruised ear, lasting for three days, was de minimis, and
        thus he did not raise valid claim for excessive use of force nor did he have
        requisite "physical injury" to support claim for emotional or mental
        suffering.  Siglar v. Hightower, 112 F.3d 191 (5th Cir. 1997).

17

(10) Qualified immunity is available to individuals sued under 42 U.S.C. § 1983. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 418 (1976).

(11) The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the test of "objective legal reasonableness." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 819 (1982).

(12) The question of reasonableness is a question of law for the court. Elder v. Holloway, 510 U. S. 510, 516 (1994); <u>Hunter v. Bryant</u>, 502 U. S. at 22 8; <u>Mangieri v. Clifton</u>, 29 F.3d at 105.

(13) Even if a defendants' conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable measured with reference to the law as it existed at the time of the conduct in question and the information that the official possessed. <u>Anderson v. Creighton</u>, 483 U.S. 63 5 639 (1987); <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985).

(14) The substantive law of the claim determines which fact issues are material. Id.

(15) Qualified immunity recognizes that, "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." <u>Harlow v. Fitzgerald</u>, 457 at 819 (citations omitted).

(16) A person is not necessarily liable under section 1983 if it violates its own rules, guidelines, or standards. <u>Murray v. Mississippi Department of Corrections</u>, 911 F.2d 1167 (5th Cir. 1990); <u>Jackson v. Cain</u>, 864 F.2d 1235, 1251 (5th Cir. 1989); <u>Hernandez v. Estelle</u>, 788 F.2d 1154 (5th Cir. 1986).

(17) Under the first part of the test for qualified immunity, it is not enough to show that the right in question is established at a high "level of generality," as for example "the right to be free from unreasonable searches and seizures." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987). Instead, "the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant sense." Id. at 640. Although the prior decisions need not have dealt with facts or "the very action in question," nevertheless, the "contours of the right" allegedly infringed must be "sufficiently clear that a reasonable official would understand that what he was doing violates that right." <u>United States v. Lanier</u>, 520 U.S. 259 (1997) (quoting <u>Anderson v. Creighton</u>, 483 U.S. at 640).

(18) Under the second prong of qualified immunity analysis, if reasonable officials in an official's position "could have believed [his actions] to be lawful, in light of clearly established law and the information [he] possessed," then the official is entitled to qualified immunity. Anderson, 483 U.S. at 641.

18

(19)   The official's "subjective beliefs about [the challenged decisions] are irrelevant." Id.; see also <u>Pfannstiel v. City of Marion</u>, 918 F.2d at 1182 ("[I]t is therefore irrelevant whether the defendants in this case acted with intent to injure as long as their conduct was objectively reasonable.").

(20)   So long as public officials of reasonable competence could differ on the constitutionality of the actions at issue, the defendants are immune from suit and liability in their individual capacity. <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1273 (5th Cir. 1992), cert. denied, 506 U.S. 973 (1992).

(21)   It is not enough for the plaintiff to show that a "more reasonable interpretation of the events can be constructed." <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991). Instead, to overcome the defendants' qualified immunity, the plaintiff must establish "that no public official of reasonable competence could have believed that the actions of the individual defendants were lawful." <u>Thompson v. City of Arlington</u>, 838 F. Supp. 1137, 1150 (N.D. Tex. 1993) (paraphrasing <u>Malley v. Briggs</u>, 475 U.S. at 343). 16.

(22)   The determination of whether a reasonable official in the official's circumstances as viewed from the official's perspective could have believed his conduct to be legal is a question of law for this Court. <u>Elder v. Holloway</u>, 510 U.S. 510, 516 (1994); <u>Hunter v. Bryant</u>, 502 U.S. at 228; <u>Mangieri v. Clifton</u>, 29 F.3d at 105.

(23)   Courts should be careful not to engage in second-guessing officers in situations in which they have to make split-second, on-the-scene decisions while confronted with a violent individual. "Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff." <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 445 (5th Cir.1998) (citing Anderson, 483 U.S. at 641). Consequently, "even law enforcement officials who reasonably but mistakenly use excessive force are entitled to immunity." Id. at 447 (internal citations and punctuation omitted).

### 9.  <u>CONTESTED PROPOSITIONS OF LAW</u>

None.

### 10.  <u>EXHIBITS</u>

A.   **PLAINTIFFS' EXHIBITS:**  See attached Exhibit List attached hereto as Exhibit "E".

B.   **DEFENDANTS' EXHIBITS:**  See attached Exhibit List attached hereto as Exhibit "A".

## 11. WITNESSES

A.   **PLAINTIFFS' WITNESSES:**  See attached Witness List attached hereto as
     **Exhibit "F".  (NOTE:** With respect to several of the witnesses, Plaintiffs
     anticipate playing the videotapes of their depositions at trial.  Specifically,
     Plaintiffs designate certain pages and lines which are contained on the
     attachment to **Exhibit "F"**.

B.   **DEFENDANTS' WITNESSES:**  See attached Witness List attached hereto as
     **Exhibit "B"**.

## 12. SETTLEMENT

This case will have to be tried.  Most recently, the parties and their

counsel engaged in a non-binding mediation conference on June 22, 1998 before

Judge Gilberto Hinojosa.  However, a settlement was not reached.

## 13. TRIAL

A.   **PROBABLE LENGTH OF TRIAL:**

     Plaintiffs' case-in-chief will take approximately four (4) days for trial.
     Plaintiffs' rebuttal may take approximately two (2) days.

B.   **LOGISTICAL PROBLEMS:**

     Plaintiffs' and Defendants' experts must be notified of the trial date at least
     three days in advance.  There may be logistical problems in encountering
     the availability of some of the witnesses.

## 14. ATTACHMENTS

A.   **DEFENDANT'S ATTACHMENTS:**

     1.   **Attachment "A":**  Defendant's Exhibit List.

     2.   **Attachment "B":**  Defendant's Witness List.

     3.   **Attachment "C":**  Defendant's Proposed Jury Instructions and
          Issues.

     4.   **Attachment "D":**  Defendant's Proposed Voir Dire.

20

**B.** **PLAINTIFFS' ATTACHMENTS:**

5. **Attachment "E":** Plaintiffs' Exhibit List.

6. **Attachment "F":** Plaintiffs' Witness List.

7. **Attachment "G":** Plaintiffs' Proposed Jury Instructions, Definitions, and Interrogatories.

8. **Attachment "H":** Plaintiffs' Proposed Questions on Voir Dire of Jury Panel.

**DATED** this _____ day of _____, 2001.


_____
**UNITED STATES DISTRICT JUDGE**

21

**APPROVED BY:**

**LAW OFFICES OF**
**ERNESTO GAMEZ, JR., P.C.**
777 East Harrison Street
Brownsville, Texas 78520
Telephone No.: (956) 541-3820
Facsimile No.: (956) 541-7694

BY: _____
       VICTOR QUINTANILLA
       State Bar No. 00786181
       Federal Id. No. 16073

       Attorney-in-Charge for Plaintiffs **MARIA F. GUAJARDO, INDIVIDUALLY,**
       and as **ADMINISTRATOR OF THE ESTATE OF JUAN JOSE GUAJARDO,** and
       as **GUARDIAN OF THOMAS GUAJARDO, III, CYNTHIA GUAJARDO,** and
       **CAROLINE GUAJARDO, MINOR CHILDREN,** and **ALEJANDRO GARCIA**

**WILLETTE & GUERRA, L.L.P.**
3505 Boca Chica Blvd., Suite 460
Brownsville, Texas 78521
Telephone No.: (956) 541-1846
Facsimile No.: (956) 541-1893

BY: _____ (with permission)
       GEORGE C. KRAEHE
       State Bar No. 00792631
       Southern District of Texas No. 19355

       Attorney-in-Charge for Defendant **EDUARDO TREVIÑO, INDIVIDUALLY**

22